Donald R. ELBEL, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 8306.

United States Court of Appeals
Tenth Circuit.

July 14, 1966.

Murry L. Randall, St. Louis, Mo. (Morris A. Shenker, St. Louis, Mo., Herbert Fredman, Overland, Kan., and Joseph H. McDowell, Kansas City, Kan., with him on brief), for appellant.

Thomas E. Joyce, Kansas City, Kan. (Newell A. George, U. S. Atty., Mahlon M. Frankhauser, Atty. and Asst. Director, and David J. Myerson, Atty., Securities & Exchange Commission, Washington, D. C., with him on brief), for appellee.

Before MURRAH, Chief Judge, SETH, Circuit Judge, and CHRISTENSEN, District Judge.

MURRAH, Chief Judge.

This is an appeal by Elbel from a judgment and sentence pursuant to a guilty verdict on five counts of an indictment charging separate violations of the anti-fraud provisions of the Security Act of 1933, 15 U.S.C. § 77q(a), and eight counts of mail fraud in violation of 18 U.S.C. § 1341.[1] All counts essentially accuse the appellant of having devised an unlawful scheme to offer and sell investment certificates of the Coffeyville Loan and Investment Company (herein called CLIC) by means of fraudulent misrepresentations, specific failures to state material facts, by engaging in misleading transactions which deceived purchasers of the securities; and use of the mails to either make these representations or to deposit monies derived from sale of the certificates.

It is noteworthy at the outset that Elbel does not deny performance of the specific acts and transactions relied upon by the Government to prove each count on which he was convicted. He simply says that the evidence was entirely insufficient to prove that he intended to devise a scheme to defraud—an essential element of every count on which he was convicted.

The basic facts are that on February 7, 1958, appellant-Elbel indirectly purchased[2] substantially all of the outstanding common stock of CLIC and contracted to purchase all its preferred stock on an installment basis. Appellant became the president of the company and assumed control of its operations which consisted of investing monies received from the public sale of investment certificates in secured loans, selling insurance, and servicing mortgages held by other investment institutions. CLIC also owned 90% of

---

1. Appellant was indicted on twenty-three separate counts. Eleven counts charged security fraud in violation of 15 U.S.C. § 77q(a) and ten counts charged mail fraud in violation of 18 U.S.C. § 1341. Also, two counts charged the sale of securities outside the state of Kansas without registration with the SEC in violation of 15 U.S.C. § 77e(a), (1), (2). Twenty-two counts were submitted to the jury which acquitted appellant of selling securities outside the state and five other charges. The trial court then acquitted the appellant on two counts.

2. The contract to purchase was made in the name of appellant's Elbel Construction Company which assigned its rights to appellant's Wadsworth Acceptance Company. These contract rights and the stock acquired thereunder were ultimately assigned to appellant's Elbel Enterprises, which was the holding company for appellant's diversified corporate interests.

the outstanding stock of Pepsi-Cola Moken Inc.

Upon acquisition of CLIC, Elbel continued the sale of the investment securities by means of an extensive advertising campaign and immediately began developing lines of credit with banks located throughout the country and particularly with the Arizona Savings and Loan Association (herein called ASLA). These organizations loaned money to CLIC which was in turn loaned to various corporations owned by Elbel, particularly the Elbel Construction Company. Elbel sold CLIC's Pepsi Cola stock to Elbel Enterprises for a book loss of $292,000. In an effort to offset CLIC's losses on this transaction and other losses incurred under prior ownership as well as to reduce the debt owed CLIC by the Elbel Construction Company, CLIC exchanged Elbel Construction's outstanding note for real estate two days prior to the end of CLIC's fiscal year (October 31, 1958). This property was in turn sold to appellant's Elbel Enterprises for $200,000 profit. CLIC's mortgage servicing business was then sold to Elbel's Acceptance Corporation for a net profit of $285,000. These transactions purported to create retained earnings of $50,926.36 and a profit of $27,285.45 for the year. At this time two-thirds of CLIC's 6 million dollars in assets were invested in companies owned by Elbel.

During the latter part of 1958, Elbel applied to the Kansas Securities Commission for authority to sell $2,500,000 of investment certificates. The Commission authorized the issuance of an additional $50,000 of certificates and requested a consolidated audit of all appellant's companies before it would authorize the requested amount. In an effort to comply with this request, appellant hired an accounting firm to bring the books of all of his companies up to date and to perform a consolidated audit. In March the accounting firm presented a preliminary financial statement indicating that Elbel Enterprises, the holding company for appellant's interests, had a deficit of $1,-342,000 and that Elbel Construction Company, CLIC's principal debtor had a $702,000 deficit. A dispute arose between the auditors, Elbel, and his financial advisers over the accounting methods used in arriving at the reported deficiencies. Though the record is unclear as to why the action was taken, another firm of accountants was hired to complete the work.

In this state of affairs and in April, 1959, Elbel wrote to a CLIC vice president advising him that, "At a Board of Directors' meeting, it was unanimously voted upon by all present to increase the interest rate from 4% to 4½% per annum, retroactive to January 1, 1959. * * * This new increase in interest rate is made possible through sound loans, investments, careful management and the building of ample capital funds and is in line with our company's policy of paying our customers the best possible rate at all times." This letter was reprinted in newspaper advertisements and later used as material for radio announcements.

Contemporaneous with the foregoing representations, ASLA hired Stanton, Elbel's partner in another corporate venture, to purchase and complete all of appellant's construction projects on which ASLA had loaned money. Lengthy negotiations resulted in a three party June, 1959, agreement among Elbel, ASLA and Stanton. By the terms of this agreement, Stanton acquired Elbel's interest in other companies they owned jointly. Elbel and CLIC were to be released from liability for the funds that ASLA had advanced to Elbel's construction companies through CLIC. All Elbel intercompany debts of both the purchased and retained companies were to be wiped out except those owing CLIC. Thus, the companies taken over by Stanton owed CLIC approximately $900,000. Elbel's retained companies still owed CLIC $900,000. Six days later, ASLA was placed in involuntary receivership.

News of ASLA's receivership and its effect on CLIC's line of credit did not immediately reach the public because of a newspaper strike. When the papers

carried the news and many investors attempted to liquidate their CLIC investment certificates, CLIC continued to require thirty days notice for withdrawals, advertise, accept deposits and otherwise continue business as usual, even though it lacked the funds necessary to repurchase the investment certificates. However, two weeks later, Elbel filed a Chapter X bankruptcy petition in federal court for CLIC.

Elbel and his attorney negotiated with he receiver of ASLA and Stanton in an effort to secure the performance of the une agreement which they felt would save CLIC from financial ruin. When these efforts failed, Elbel's further negotiations with ASLA resulted in an April, 1960, agreement in which CLIC received approximately $752,000 in assets. These asset were subsequently sold by Elbel to Drewerys Limited netting CLIC approximately $550,000.

To summarize, the evidence indicates that after acquiring control of CLIC, Elbel created a questionable financial statement by trading off some of CLIC's assets for promissory notes and by the shifting of real estate at a unilaterally determined value between CLIC and Elbel controlled companies. On the basis of this financial statement which Elbel's accountant refused to certify because of his inability to confirm the values of the property transferred and the abnormality of the transactions, appellant then paid CLIC's investors their usual 4% dividend. In this setting Elbel pressed his demands for authority to issue additional certificates and at the insistance of the Kansas Security Commission hired an accounting firm to bring the books of CLIC and all of his other companies up-to-date and to perform a consolidated audit. On receipt of an unfavorable preliminary report, he suppressed the report, discharged the accounting firm and hired another firm to complete the audit. Despite this report indicating the financial instability of Elbel Construction (one of CLIC's principal debtors) and his admitted lack of knowledge regarding CLIC's true financial condition, Elbel, without the knowledge or approval of CLIC's Board of Directors, increased CLIC's interest rate to 4½% not only prospectively but retroactively to the first of the year. Under Elbel's direction, news of this action was immediately disseminated to the general public and specifically CLIC's investors, representing that "Safeguarding your investment is a very important part of our business. We know CLIC is succeeding in that objective through secured loans, investments, careful management and the building of ample capital funds."

After word of ASLA's bankruptcy caused a run on CLIC late in June, Elbel testified that he considered putting CLIC in receivership but was dissuaded from doing so by his attorney on the vain hope that the June agreement would be carried out. Despite this knowledge, Elbel continued operating CLIC's business as usual and in fact paid the July 1 dividend and sent a letter to all investors telling them the increased interest rate was credited to their account and reiterating that "We know CLIC is succeeding in that objective through secured loans, investments, careful management, and the building of ample capital funds." The letter then recommended that the investor add to his account every month.

In sum the jury was instructed that as used in each count of the indictment the term "willfully and knowingly" meant acts done with an evil motive or bad purpose either to disobey or disregard the law; that fraudulent intent is an essential ingredient of the offenses charged; that good faith and honest belief in the representations made by the accused is a valid defense and it was incumbent upon the prosecution to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt. The jury was also told that since fraudulent intent as an element of a crime is often difficult to prove by direct and convincing evidence, it might be inferred by a series of isolated acts and incidents.

It is, of course, settled law that in appraising the sufficiency of the evidence to justify an inference of fraudu-

lent intent and bad purpose, we must, of course, view the evidence in its most favorable light to the government. See Gusow v. United States, 10 Cir., 347 F.2d 755; Beck v. United States, 10 Cir., 305 F.2d 595; Halfen v. United States, 10 Cir., 324 F.2d 52; Cartwright v. United States, 10 Cir., 335 F.2d 919; Kelling v. United States, 10 Cir., 193 F.2d 299. When the basic facts are considered in this context, they support the inference that Elbel proceeded heedlessly and recklessly to sell and offer to sell CLIC securities in the face of danger signals indicating that the financial condition of CLIC and Elbel's related enterprises did not warrant the positive representations he made to investors and prospective investors. This being so, the court was warranted in submitting to the jury the basic issue whether on these facts Elbel intended to devise a scheme to defraud the CLIC investors.

■ Appellant complains of the trial court's refusal to admit a letter from his attorney and related testimony of his attorney to the effect that Elbel carried out his part of the June 9 agreement and honestly believed the agreement would be honored according to its terms until and even after he filed the Chapter X bankruptcy for CLIC in July. The argument is that if the June 9 agreement had been performed according to its terms as he honestly believed, CLIC would have been financially safe and sound. As a sequel Elbel calls attention to the fact that even after the bankruptcy he and his attorney continued to diligently negotiate with ASLA and that such negotiations culminated in the April 30, 1960, agreement resulting in the receipt of property having a value of approximately $752,000, later sold in the Drewery transaction in which CLIC realized approximately $550,000. Elbel offered to prove that his attorney negotiated the April 30 and subsequent Drewery agreements as evidence of his good faith.

Details of all these transactions were admitted into evidence as were two subsidiary documents tending to show implementation of the June 9 agreement. One was a receipt from Stanton for the stock of the various Elbel corporations. The other was a memorandum by the Attorney outlining the steps to be taken to carry out the June 9 agreement. These were admitted, as the court stated, to corroborate Elbel's testimony concerning his good faith belief in the performance of the June 9 agreement.

The excluded letter from Elbel's attorney to Stanton identified as Exhibit I–1, is not perpetuated in the record.[3] The proffer stated that it was dated July 24 and was offered to show that the "matter had not yet been concluded as to whether they were to go through with the June 9 agreement." The court excluded it apparently on the grounds that it was no defense stating: "You can't go out and deal with broke corporations and then claim that because you might have got money out of them that would have pulled a rabbit out of a hat for you. It is not a defense to a case of this kind."

It is quite evident from the colloquy between court and counsel that the defense was accorded a wide latitude in the scope and extent of the testimony offered and admitted in support of the defense of good faith and particularly insofar as the testimony, oral or documentary, tended to show a basis for Elbel's belief that the June 9 agreement would be performed and CLIC would be safe for its investors.

■ The court also excluded proffered evidence of the negotiations leading up to the April 30 and Drewery transactions because after bankruptcy CLIC's finan-

---

3. In a footnote the government's brief states that Exhibit I-1 "was merely a letter of transmittal dated July 21, 1959, from the witness King to Stanton enclosing a copy of an amended June 9 agreement which King had signed pursuant to Elbel's authorization. The letter, however, stated that the execution of this agreement for Elbel was conditional upon Stanton's execution of the agreement by July 24, 1959, and upon the approval of the state Superior Court in Arizona by July 24, 1959."

cial standing was irrelevant to the question of good faith and honest belief when the alleged false representations were made and CLIC was in a failing condition. It may be that the proffered testimony of the attorney, though it is not spelled out in the proffer, had some relevancy as corroborative evidence of Elbel's belief in the ultimate performance of the contracts which did indeed redound to the substantial benefit of CLIC. To paraphrase United States v. Tellier, 2 Cir., 255 F.2d 441, 449, Elbel's belief in CLIC's eventual prosperity could not serve to lessen the culpability of his conduct when CLIC was in a failing condition. See also Knight v. United States, 5 Cir., 123 F.2d 959. We do not think the trial court unduly circumscribed the evidence touching Elbel's good faith and honest belief in the eventual stability of the company whose certificates he offered to the public as a safe and sound investment.

■ Complaint is made of instruction numbered 27, relating to the transactions embodied in the June 9 agreement. This instruction recited the contention that Elbel and his attorney had performed all of Elbel's commitments under the agreement and that if ASLA had performed its part, CLIC would have been solvent and capable of meeting all of its obligations. The jury was then told that they may consider this transaction in determining the intent of Elbel to commit the offenses with which he was charged. But, if they found beyond a reasonable doubt that the representations and statements charged were made willfully and knowingly with evil motive and bad purpose, the fact that ASLA failed to carry out its part of the contract would not excuse him from having made the false or misleading statements.

Elbel's point on appeal is that the instruction was improperly restricted to the issue of intent and that the jury should have been told they may also consider the agreement as evidence of solvency at that time to negate any purported scheme to defraud. The objections to the instruction on the record are not clear, but as we read and interpret them, they are to the effect that the instruction restricted consideration of the contracts to the issue of intent, and, moreover, excluded their consideration as evidence of Elbel's honest belief in the solvency of the company insofar as it affected his intent.[4]

It may be conceded that the June 9 transaction was relevant evidence of the fair market value of CLIC's assets and that CLIC was thus solvent. It may also be conceded that the parties contracted in recognition of CLIC's solvency. But, even so, evidence of solvency went only to the issue of intent. The most that can be said for the evidence of solvency is that it tended to show good faith or lack of intent to devise a scheme to defraud by the sale of securities of an insolvent enterprise. We think the trial court's instruction in that regard adequately covered the issue.

Complaint is made of the instructions of the court on the critical issues of fraudulent intent, good faith and ignorance of the falsity of the representations and of the refusal of the court to give requested instructions on these issues. Specifically, complaint is made of that part of instruction numbered 15 which told the jury, "Ignorance of the falsity of representations, if any, is no defense if the defendant could have ascertained the falsity, if you so find, by the exercise of reasonable diligence. If the defendant was ignorant of the falsity of representations made by him he cannot be convicted unless you find that he failed to exercise the diligence in ascertaining the facts that would be expected of a reasonably

---

4. Counsel for Elbel objected to the instruction stating:

"* * * I believe that the contracts falling within the period of indictment as an integral part of the case and cannot be considered only in conjunction with intent; that it tends to eliminate, particularly in the last portion of it, the use of the contract on the question of intent, and the belief and knowledge of the defendant of his solvency at that moment."

prudent person. A person who is supposed to know matters pertaining to his own business and one who makes representations, not knowing whether they be true or false, cannot be regarded as innocent, for a positive assertion of fact is by plain implication an assertion of knowledge concerning the facts asserted. In other words it is the law that a person intends the usual and probable consequences of his acts." This instruction is said to erroneously apply the mere negligence or reasonable man test in determining criminal intent.

 One cannot be held to guilty knowledge of falsity of his statements simply because a reasonable man under the same or similar circumstances would have known of the falsity of such statements. See Shaddy v. United States, 10 Cir., 30 F.2d 340; West v. United States, 10 Cir., 68 F.2d 96; Babson v. United States, 5 Cir., 330 F.2d 662, reaffirmed Gusow v. United States, 347 F.2d 755; United States v. Benjamin, 2 Cir., 328 F.2d 854. We have said, following well established case law, that a scheme to defraud under the mail fraud statute is one which is "reasonably calculated to deceive persons of ordinary prudence and comprehension" and that the requisite willful intent may be inferred from activities of the parties and evidenced by statements that are not only patently false but made with "reckless indifference" as to whether they are true or false. Gusow v. United States, supra; Babson v. United States, supra; United States v. Benjamin, supra. The court followed the reckless indifference test by telling the jury in instruction numbered 19 that to make a representation fraudulent it was not sufficient that the statement be untrue, but the jury must find that the person making the statements or causing them to be made knew they were untrue or that they were recklessly made without knowledge or care as to whether true or false. When instructions 15 and 19 are considered in totality and as they relate to guilty intent, we cannot say they do not adequately and correctly state the applicable law of the case on ignorance of the falsity or that they misled or misguided the jury with respect thereto.

 The separately numbered and stated instructions were not designed to achieve a cohesive statement of applicable law of the case. Some of them were necessarily abstract definitions of the critical terms "willfully and knowingly", "fraudulent intent", "good faith", "honest belief", "ignorance of the falsity of the representations", all related terms descriptive of the essential element of fraudulent intent. The separate instructions on these related critical terms are to some extent repetitively stated in different phraseology. They were not given in the language of the requested instructions. But, "No court is bound to give instructions in the form and language in which they are asked. If those given sufficiently cover the case and are correct, the judgment will not be disturbed whatever those may have been which were refused. We know as a practical matter that most requested instructions are colored with the advocate's views of his client's cause and cannot fairly be given in the requested language." Tyler v. Dowell, 10 Cir., 274 F.2d 890, 897, quoting Railway Co. v. McCarthy, 96 U.S. 258, 265, 24 L.Ed. 693. But, the judge does not fulfill his inescapable duty to guide, direct and assist the jury toward an intelligent understanding of the legal and factual issues by mere abstract statements of legal definitions. He must fairly and impartially state the issues and applicable law in logical sequence and in the common speech of man if the jury is to understand the issues and intelligently apply the law. See Tyler v. Dowell, supra and cases cited. We are unable to say that the jury did not intelligently understand and apply the law of the case.

The appellant also charges that the giving of the so-called "Clainos" and "Allen" instructions by the trial court was coercive under the attendant circumstances. The record indicates that the case was submitted to the jury Thursday afternoon at 2:30. The jury was permit-

ted to separate at 5:00 p.m. and reconvene on Friday at 9:00 a.m. After they had deliberated until 5:00 p.m. that day, the judge called them back into the court room and inquired "Without indicating at all to the court in any way * * * how the jury stands, are you able to tell us whether you are making any progress?" A member of the jury replied, "We have made progress." The court then suggested that the jury go to dinner and return later in the evening. The foreman of the jury interrupted to say, "We have our verdict." The court replied, "I take it that you have not reached a unanimous verdict on all counts." The foreman answered, "That is right, Your Honor." The court then gave an instruction identical to the one found in Clainos v. United States, 82 U.S.App.D.C. 278, 163 F.2d 593, 596, as follows:

"I suggest—and this is only a suggestion—that perhaps you can make orderly progress and most expeditious progress if you proceed systematically and take the various counts of the indictment, one by one, and reach a conclusion on each count, if you can, separately. If you should come to a situation where you can agree on a verdict on some of the counts, but not on the others, come in and return a verdict on those counts that you can agree on and then we will determine whether to send you back and ask you to deliberate on other counts. In that way, I think you will find that progress can be made most effectively as well as most systematically."

The jury then went to dinner and upon its return the judge delivered an Allen type instruction, Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528, in which the jury was told that in addition to the suggestions made before recess the court wished to suggest a few thoughts which may be desirable to consider along with all the evidence and the other instructions. The court then told the jury that this was an important case, that it had been an expensive trial and that if they failed to agree, there would be another expensive trial to a jury of twelve men and women not more intelligent, impartial or competent. The court stated that it was "unnecessary to add that the court does not wish any juror to surrender his or her conscientious convictions * * * solely because of the opinion of other jurors or for the mere purpose of returning a verdict. However, it is your duty as jurors to consult with one another and to deliberate with a view to reach an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but you should do so only after a consideration of the evidence with your fellow jurors. And, in the course of your deliberations, you should not hesitate to change your opinion when convinced it is erroneous." The court went on to say, "If much the greater number of you are for a conviction, each dissenting juror ought to consider whether a doubt in his or her own mind is a reasonable one, since it makes no effective impression upon the minds of so many equally honest, equally intelligent fellow jurors." And, if on the other hand, a majority or even a lesser number were for acquittal, the other jurors ought seriously to ask themselves whether they had reason to doubt the correctness of their judgment in the light of the other jurors who remain unconvinced beyond a reasonable doubt. The jury was finally admonished to "Remember at all times that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of evidence. But remember also that, after full deliberation and consideration of all the evidence, it is your duty to agree upon a verdict, if you can do so without violating your individual judgment and your conscience." Later that night the jury returned its verdict.

Elbel duly excepted to the giving of the Allen instruction and contends here that this instruction when considered in conjunction with the Clainos instruction was erroneously coercive.

We have cautiously approved the so-called Allen instruction even when made to an apparently deadlocked jury,

provided the jury is made to understand that they are free to follow their conscientiously held convictions. Carter v. United States, 10 Cir., 333 F.2d 354; Mills v. Tinsley, 10 Cir., 314 F.2d 311; DeVault v. United States, 10 Cir., 338 F.2d 179. It is the duty of a common law judge not only to instruct the jury on the law of the case in language which they can understand and apply to facts, but it is also within his inescapable duty to guide and assist them in their search for truth and this is especially true where, as here, the facts involved are complicated. The paramount consideration is, of course, that the jury be given to understand that they should not compromise their conscientious convictions on the facts.

In the first place, there is nothing here to indicate that the jury was deadlocked. They had reported progress, but had not unanimously agreed on all counts in the indictment. The first supplementary instruction suggested procedures by which they should logically approach consideration of the multiple counts in the indictment. The other charge was an admonition to reason with each other. In the circumstances in which it was given, we do not think the charge was improper.

Elbel contends that the trial court erroneously denied his motion to suppress certain evidence obtained from or as a result of alleged illegal searches of ASLA's and CLIC's books and records. The denial is based upon these pertinent facts either found by the trial court or not in dispute. When ASLA was placed in Arizona state court receivership in June, 1959, the receiver permitted an FBI agent to search all of the company's records without a warrant or an order of the court. This search furnished leads which prompted a federal grand jury in Arizona to subpoena the books and records of CLIC and other related Elbel companies. The grand jury returned an indictment against certain ASLA officials and Elbel. This indictment was later dismissed and another indictment was returned in 1962. The ASLA corporate records were suppressed, the Arizona court holding that the corporate officers of ASLA had requisite standing and were aggrieved by the search and seizure of ASLA's corporate records. See United States v. Kanan, D.C., 225 F.Supp. 711, appeal dismissed, 10 Cir., 341 F.2d 509. The CLIC and allied Elbel books and records which had been subpoenaed remained in Arizona until sent to the United States Attorney in Kansas. Meanwhile, the SEC had entered its appearance in the CLIC Chapter X bankruptcy proceedings in Kansas at the request of the court and had found cause for investigation. An SEC attorney searched CLIC's books and records with the permission of the trustee without a warrant or subpoena. The trial court brought the matter of possible criminal activities to the attention of the United States Attorney and the FBI conducted an investigation of CLIC's records with the permission of the trustee.

Elbel's motion to suppress is apparently directed to all records of ASLA, CLIC and other Elbel controlled companies which were covered by the Arizona grand jury subpoena as well as all CLIC records obtained by the SEC and FBI searches in Kansas. Apparently no ASLA records were offered in evidence in these proceedings, but Elbel sought to suppress all of the CLIC and allied company records subpoenaed by the Arizona grand jury and later returned to Kansas on the grounds that the Arizona search was directed to him, and he thus has standing as a "person aggrieved" by the search to challenge the introduction of these records in this proceedings because they are the fruits of the ASLA poisoned tree. As further grounds for suppression of the CLIC records, Elbel takes the position that the bankruptcy trustee was without authority to turn them over to the investigating agents without a warrant or subpoena, and since the search was directed against him, he may complain of it.

The trial court found first that inasmuch as Elbel was not an officer of ASLA nor in any way interested in it except as a borrower, had no interest or

control over the books and records of that company, and was not present during the investigation, his privacy was never invaded "even to the slightest degree". The court concluded, therefore, that he had no standing to challenge the search and seizure of the ASLA records. The motion to suppress the CLIC records was denied on the further ground that the trustee in bankruptcy who at all times material here had complete custody and control of the books and records had authority and was under a duty to disclose them to the government agents in the public interest; that since Elbel had no right to custody or control over the records, he had no standing to complain of the search.

Elbel rests his standing to complain of the Arizona search on the rationale of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, as we interpreted it in Villano v. United States, 10 Cir., 310 F.2d 680, and the Fifth Circuit interpreted and applied it in Henzel v. United States, 296 F.2d 650. He says that under the rationale of these cases the important and essential basis for his standing to challenge the Arizona search is that he is one of the persons against whom the Arizona search was directed and he is, therefore, a person aggrieved within the meaning of Rule 41(e) F.R. Crim.P.

In Villano we interpreted Jones to repudiate the age-old concept that some claim of property or possessory interest in the place and the thing searched is requisite to standing to challenge the validity of the search, and to establish the new concept that any one legitimately on the premises searched against whom the search was directed has standing to challenge the constitutionality of the search. Following Jones, we held that an employee of a corporation had standing to challenge the legality of the search of his desk in the company office even though he neither owned nor had exclusive possession of the desk. The important consideration was that "the search of appellant's personal belongings at his home and in his desk where he worked clearly was 'directed at' the appellant." Without attempting to assess the full import of Jones, the Fifth Circuit in Henzel applied it by analogy to the search of corporate records in the office of the president on the grounds that the search was directed against him and he, therefore, had standing to challenge it. See Peel v. United States, 5 Cir., 316 F.2d 907; and see also United States v. Hopps, 4 Cir., 331 F.2d 332, 340.

This court in Villano, like the Fifth Circuit in Henzel, found it unnecessary to probe the outer limits of the rationale of Jones. It was enough in both cases that the search and seizure was directed at the person challenging it and that in each case the right of privacy was invaded by such search. In Henzel the privacy of the president's office was invaded to seize corporate records directed at him. In Villano the search was of a desk where the victim worked and was clearly directed at him.

Jones, of course, recognizes the basic concept that restrictions upon search and seizure were obviously designed for protection against official invasions of privacy and security of property and that one who seeks to challenge the legality of a search "must establish that he himself was the victim of an invasion of privacy." Jones v. United States, supra, 362 U.S. 261, 80 S.Ct. 731; see also United States v. Grosso, 3 Cir., 358 F.2d 154; Diaz-Rosendo v. United States, 9 Cir., 357 F.2d 124.

In our case, unlike Villano and Henzel, Elbel had no interest whatsoever in the corporation whose records were searched or that which was seized. He does not stand in the same shoes as the officers of ASLA whose records were searched on corporate premises and suppressed in United States v. Kanan, supra, although they were also suppressed in that case as to Elbel who was a co-defendant. Elbel's right of privacy was not invaded, and he has no standing to complain of the search although it led to the subpoena and production of records in which he did have an interest. See Wong Sun v. United States, 371 U.S. 471,

83 S.Ct. 407, 9 L.Ed.2d 441; Cf. Peel v. United States, supra; Diaz-Rosendo v. United States, supra. We also agree with the trial court that Elbel had no standing to complain of the search of CLIC's records which were at that time in the exclusive custody of the trustee in bankruptcy. As Judge Templar observed: "The examination of books, records and papers of a financial corporation such as Coffeyville Loan and Investment Company, by government officers charged with the responsibility of protecting the investing public from fraud and chicanery, after such books, records and papers have been voluntarily placed in the custody of an officer of this Court in a voluntary bankruptcy proceeding by the principal officer of the corporation invades no constitutionally guaranteed rights or privileges of the corporation's officers who are later charged with violation of laws * * *." See also In re Tracy & Co., D.C., 177 F. 532; Cf. Bisno v. United States, 299 F.2d 711, cert. den. 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818, reh. denied 371 U.S. 855, 83 S.Ct. 51, 9 L.Ed.2d 94.

Finally, error is claimed in the admission of an audit made of the Elbel Construction Company in 1959 after it was taken over by Stanton and had been closed down. The audit indicated a deficit of $1,435,662.59 as of May 31, 1959, and was admitted over Elbel's objection that it was immaterial. It is urged on appeal that the government had the duty to establish that the audit truly represented the condition of the Elbel Construction Company before it could be properly admitted and that since such evidence was not introduced, the exhibit should have been excluded as immaterial, particularly in the light of its highly prejudicial nature.

The audit was offered as a part of the cross-examination of Elbel under these circumstances: As we have seen, an auditing firm employed to audit CLIC and other Elbel companies, reported in March, 1959, a deficit of approximately $1,300,000. On cross-examination Elbel was asked about the audit and admitted that it did show the deficit but that he did not believe it. The first auditing company was apparently discharged and Elbel employed another firm to perform the audit. He was then asked if this audit as of two months later, May 31, 1959, didn't show a loss to the Elbel Construction Company of $1,400,000. He answered that he didn't know because he was not familiar with it; that he had engaged the auditing firm to make the audit, but before it was submitted Stanton had taken over the companies. On further cross-examination he conceded that according to the letter of transmittal the audit showed a deficit in the construction company of approximately $1,435,-000 as of May 31, 1959. Further examination concerning the audit was then objected to on the grounds that it was not in evidence. The audit was then offered and objected to "for the reason that it is immaterial"; that "it was made subsequent to all events involved, was delivered to Mr. Stanton after he got the company some several months later." The court then said "Well, if it was made as of May 31, 1959, the court thinks it might be relevant", and "If that is your only objection * * * the court is going to receive it." Counsel for Elbel made further objection that it had not been "properly identified either." The court agreed that it had not and that the witness Elbel "has answered the only thing that is material about it anyway." The objection was sustained. There was further cross-examination concerning Elbel's knowledge of the audit and that it showed a loss. The audit was then reoffered and again objected to on the grounds that it had not been "properly identified". The court sustained the objection on the grounds that the witness had never examined the audit. Thereafter, Stanton, who had taken over the companies, was recalled to the witness stand to identify the audit which Elbel ordered and which was delivered to the audited company after Stanton had purchased Elbel's properties. After this identification, the exhibit was again offered into evidence, was objected to as "being immaterial", and the court received it.

We think the exhibit was material as a part of the cross-examination of Elbel. If it did not truly reflect the condition of the company as of May 31, 1959, it was well within the province of the appellant to attack it on that ground. The question whether it truly and accurately reflected the condition of the company went to the weight of the evidence, not to its admissibility.

Finding no reversible error in the trial of the case, the judgment is affirmed.