558 F.2d 171
 UNITED STATES of America
v.
Carlo BENEDETTO, Benito John DeGaetano, James Sheehan.
Appeal of Benito John DeGAETANO, in No. 76-1779.
Appeal of James SHEEHAN, in No. 76-2042.
 Nos. 76-1779, 76-2042.
 United States Court of Appeals,
Third Circuit.
 Argued May 6, 1977.
Decided June 22, 1977.
As Amended July 14, 1977.
 
 Michael D'Alessio, Jr., West Orange, N. J., for DeGaetano and Sheehan.
 David A. Ruhnke, Asst. Federal Public Defender, John F. McMahon, 1st Asst. Federal Public Defender, Newark, N. J., for Sheehan.
 Jonathan L. Goldstein, U. S. Atty., John J. Barry, James A. Plaisted, Asst. U. S. Attys., Newark, N. J., for appellee.
 Before GIBBONS, MARIS, HUNTER, Circuit Judges.
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 Benito DeGaetano and James Sheehan were convicted by a jury on all eight counts of an indictment charging them with conspiracy to use extortionate means to collect extensions of credit in violation of 18 U.S.C. § 894[1] (Count I), making extortionate extensions of credit in violation of 18 U.S.C. § 892[2] (Counts II, III, IV, and VII), and using extortionate means to collect or attempt to collect extensions of credit in violation of 18 U.S.C. § 894 (Counts V, VI, and VIII). Because of the insufficiency of proof and an improper charge connected with Counts I, VII, and VIII, we must vacate and remand appellants' convictions on those counts. We must also vacate and remand the convictions on all the counts charging the making of extortionate loans (II, III, IV, and VII), since the court in its charge on those counts improperly deprived the jury of its fact-finding role. We find no error, however, in the convictions on Counts V and VI (using extortionate means to collect extensions of credit) and affirm the judgments of conviction on those counts.
 
 I.
 
 2
 Because the questions on appeal deal principally with the sufficiency of proof and the relation between the court's charge and the evidence, a fairly detailed consideration of the indictment and the evidence is required. On May 16, 1974, DeGaetano and Sheehan were indicted for violations of 18 U.S.C. §§ 2, 892, and 894. Also charged in the same indictment was one Carlo Benedetto. Benedetto was never apprehended, and the charges against him were severed at the Government's request on February 3, 1976.
 
 
 3
 Count I of the indictment charged defendants with conspiring to use extortionate means to collect extensions of credit from John Massaro and Ronald Puczilowski. Counts II, III, and IV charged the making of extortionate loans to Massaro. Counts V and VI charged the use of extortionate means to collect loans from Massaro. Count VII charged an extortionate extension of credit to Puczilowski and Count VIII the use of extortionate means to collect a loan from Puczilowski. The testimony with respect to the Massaro transaction differed greatly from that dealing with the Puczilowski loan, in that there was no evidence directly linking DeGaetano and Sheehan to the latter transaction.
 
 A.
 
 4
 John Massaro testified that he was in a financial bind in the summer of 1971. A friend told him that he could obtain a loan from Sheehan and DeGaetano. Accordingly, Massaro went to Budget Auto Sales in Passaic, New Jersey, where he found Sheehan, DeGaetano, and "Rocky" Benedetto. He borrowed $600 on which he agreed to pay "vig" interest of five dollars per hundred per week. Thus, Massaro was paying thirty dollars a week interest on the $600 loan.
 
 
 5
 A few weeks later, Massaro said, he borrowed an additional $400 and began paying an additional twenty dollars a week in "vig." In August, 1971, Massaro obtained a third loan, this time for $500, to be repaid within a week, together with another twenty-five dollars a week interest.
 
 
 6
 Massaro testified that he could not keep up the interest payments, so he began stalling the three defendants. He wrote them a check, but it bounced. When the three began to press him, he began to "move around" to avoid them. He arranged to have his sister pay the $500 immediately due. Thinking "everything was cool," Tr. at 40, Massaro went home again. Sheehan, DeGaetano, and Benedetto arrived at his home and escorted him outside, away from his wife. Benedetto was carrying a pistol. They threatened Massaro and DeGaetano punched him in the head.
 
 
 7
 In October, Massaro said, his sister finally obtained the $500, and Massaro once again began meeting his interest payments. But in December, he again fell short. When he went to Budget Auto Sales to explain, Benedetto, in the presence of Sheehan and DeGaetano, "smacked (Massaro) around a few times." Tr. at 44-45.
 
 
 8
 Massaro said that in early 1972, he went to jail for writing bad checks. Until December of 1972, when he left jail, no payments were made to Benedetto, DeGaetano, or Sheehan. At that time, he called Benedetto and promised to make good on the loan. While in jail, however, Massaro had contacted the FBI, precipitating the investigation that led to this indictment.
 
 
 9
 Patricia Ann Park, who was married to Massaro during the time in question, testified that Benedetto, Sheehan, and DeGaetano showed up at the Massaro home at least once a week during the summer and fall of 1971, looking for Massaro. Sheehan also went often to the cocktail lounge where Park worked as a barmaid, hoping to catch Massaro. They repeatedly told her that Massaro had better come up with the money. Several times, Park called Budget Auto Sales and tried to explain to Benedetto that Massaro needed more time.
 
 
 10
 On one occasion in early 1972, Park returned home from work to find Sheehan and DeGaetano ransacking her house. They made threats against Massaro, and DeGaetano struck Park.
 
 
 11
 Thereafter, Park divorced Massaro. She testified, though, that in 1973 DeGaetano entered her new home, uninvited and in the presence of her new husband, and demanded to know where Massaro was. DeGaetano told her that he wanted Massaro to pay up.
 
 
 12
 Ann D'Amore was a friend of Park. She testified that in 1971 and 1972 she was living in the Massaro home in return for performing housecleaning and babysitting services for Park. She also testified that during September, October, and November of 1971, Sheehan and DeGaetano visited the Massaro home almost every day, seeking Massaro. She was present the night Sheehan and DeGaetano ransacked the house and confirmed Park's story about being struck by DeGaetano. She said that on one occasion the defendants caught Massaro at home, choked him, and beat him.
 
 
 13
 Joseph Orrick married Patricia Ann Park after she divorced Massaro. He corroborated Park's tale of the visit DeGaetano, seeking Massaro, paid Park in her new home in 1973.
 
 
 14
 Sharon Coronos is Massaro's sister. She testified that she obtained a loan from a finance company in order to stop the defendants from hounding her brother. She gave the money to her brother-in-law, Ralph Marotta.
 
 
 15
 Marotta testified that he knew of Massaro's difficulty. He took the $500 Coronos had borrowed and gave it to Sheehan as interest on the $1,500 principal balance that Massaro still owed.
 
 
 16
 Sheehan took the stand in his own defense and admitted knowing Massaro and lending him money on three occasions. He denied charging any interest on the loans. He also denied threatening or beating Massaro and his family.
 
 B.
 
 17
 Ronald Puczilowski testified that he borrowed $600 from "Rocky" at Budget Auto Sales in January of 1971. He stated that he had "bought a car off him and . . . had a loan from him before." Tr. at 242. Neither Sheehan nor DeGaetano were involved, according to Puczilowski. He was to pay "Rocky" back seventy-eight dollars a week for ten weeks. Rocky said to him: "(D) on't take the money unless you can pay it back." When questioned about that remark, Puczilowski denied ascribing any threatening meaning to it at the time.
 
 
 18
 After making the second payment, Puczilowski lost his job. So he went to a priest at his church, Father Frederick Valentino. He told Father Valentino he had been beaten up and needed money to repay a "loan shark." Tr. at 247. After a couple of hours of hesitation the priest lent him the money.
 
 
 19
 On cross-examination, Puczilowski declared that his story to the priest had been a lie, that he had never been beaten, that he lied only to convince the priest to give him the loan.
 
 
 20
 Father Valentino testified that Puczilowski had come to him, appearing quite distraught. The priest said Puczilowski told him "he was roughed a little bit because he owed money to shylocks." Tr. at 260. After Father Valentino rounded up the $800 Puczilowski returned and took the money.
 
 C.
 
 21
 The jury convicted both defendants on all counts. All post-trial motions were denied. Both defendants were sentenced to five years on Count I, to serve a minimum of fifteen months before becoming eligible for parole, and twenty years on each of Counts II through VIII, said sentences to be concurrent with each other and consecutive to the sentence on Count I. Sentences on Counts II through VIII were suspended, and defendants were placed on probation for five years following release on Count I.
 
 II.
 
 22
 Defendants moved to dismiss Counts VII and VIII the counts dealing with the Puczilowski loan since there was no evidence that either of them was in any way involved in that transaction. They also moved to dismiss Count I conspiracy to use extortionate means to collect the loans from Massaro and Puczilowski for a similar reason: there was no evidence linking DeGaetano and Sheehan to the Puczilowski loan, but the bad acts of the absent co-conspirator, Benedetto, could "spill over" and prejudice defendants, since the count charged a conspiracy with respect to both Massaro and Puczilowski. The trial court denied these motions, and defendants raise this denial as error on appeal.
 
 
 23
 The Government contends that Sheehan and DeGaetano are tied into the substantive counts dealing with the Puczilowski loan by virtue of their conviction on Count I, charging conspiracy to use extortionate means to collect loans from both Massaro and Puczilowski. There was sufficient evidence to convict on the conspiracy count, argues the Government, in that several witnesses had testified to the concerted lending activities of the defendants centering on Budget Auto Sales. The Government's theory is that the jury believed that Benedetto, Sheehan, and DeGaetano were part of a general conspiracy to collect loans by extortionate means and convicted Sheehan and DeGaetano under Count I. By virtue of this conviction, they became liable for the acts of their co-conspirator, Benedetto, in furtherance of the conspiracy namely, making an extortionate loan to Puczilowski (Count VII) and using extortionate means to collect it (Count VIII).
 
 
 24
 The Government's theory seems plausible, but it is undercut by the instructions given by the court with respect to the conspiracy count. Although the court at first instructed the jury in accordance with the Government's theory, its last words on the subject stood that theory on its head:
 
 
 25
 I suggest as the orderly approach that you first consider counts two through eight, which are the "making" and "using" charges, before you decide count one (conspiracy). This is merely a suggestion, and the jury is free to disregard it because the jury is entitled to approach its deliberation in any way it chooses.
 
 
 26
 Tr. 406.
 
 
 27
 Under the Government's view, the only way DeGaetano and Sheehan could be linked to Counts VII and VIII the Puczilowski loan was if they were first found guilty of a broader conspiracy under Count I. Instead of emphasizing that fact, the court told the jury to consider all the substantive counts, including Counts VII and VIII, before deciding on the conspiracy charge. If the jury followed the court's suggestion, then, it could have first found defendants guilty under Counts VII and VIII even though no evidence directly connected them to Puczilowski because of their mere association with Benedetto. Then the jury could have used those improper convictions of substantive offenses to convince itself that the broad conspiracy outlined in Count I must have existed.
 
 
 28
 This course of events, if true, relegates the Government's theory to the level of bootstrap: defendants were convicted of conspiracy at least partly on the basis of their conviction of substantive offenses involving the Puczilowski loan, but the only way they could have been found guilty of those substantive offenses was if they were first found to have been members of the conspiracy. Thus, the court did not fulfill its duty to state the issues and the applicable law in their proper, logical sequence. See Elbel v. United States, 364 F.2d 127, 134 (10th Cir. 1966), cert. denied, 385 U.S. 1014, 87 S.Ct. 726, 17 L.Ed.2d 550 (1967).
 
 
 29
 Although counsel did not focus upon this erroneous charge on appeal, it is plain error. See Silber v. United States, 370 U.S. 717, 82 S.Ct. 1287, 8 L.Ed.2d 798 (1962). And because we cannot say with any degree of certainty that the jury did not follow the court's suggested, erroneous path through the indictment, the convictions on Counts I, VII, and VIII must be vacated. See, e. g., Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); United States v. Arias-Diaz, 497 F.2d 165, 171 (5th Cir.) reh. denied, 504 F.2d 760 (1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975).
 
 III.
 
 30
 Defendants also contend that the trial court invaded the province of the jury by instructing it that one of the elements of the crime of making extortionate extensions of credit was in fact present (Counts II, III, IV, and VII). In order to consider defendants' argument, an examination of the elements of the crime and the court's charge is necessary.
 
 
 31
 The Government bore the burden of proving beyond a reasonable doubt three elements of the crime of making extortionate extensions of credit: (1) an extension of credit was made; (2) it was the understanding of the defendants, as creditors, and the borrower, at the time the extension of credit was made, that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of some person; and (3) the defendants acted intentionally and knowingly. See 2 E. Devitt & C. Blackmar, Federal Jury Practice & Instructions § 57.08 (3d ed. 1977).
 
 
 32
 The trial court performed the necessary mathematical calculations and instructed the jury that if it believed the testimony of Massaro and Puczilowski concerning the amounts involved, the loans made to those two men were at interest rates of 260 percent and 264 percent, respectively. The court then instructed the jury on the effect these numbers should have upon consideration of the second element of the offense charged in Counts II, III, IV, and VII:
 
 
 33
 Finally the Court instructs you to accept as a fact, even though there has been no testimony about it, that it was so well known in New Jersey at the time these loans were made that there could be no dispute about it, that loans calling for 260 and 264% a year are what are called shylock or loanshark loans. In other words, any such loan carrying that kind of exorbitant interest, from that fact alone it would be understood by both the lender and the borrower at the time the loan was made that it would be a loan on which failure to repay or delay in repayment could result in the use of violence or other criminal means to cause harm to person or property.
 
 
 34
 You are allowed to take this instruction into account along with all the other circumstances. Please keep in mind that a loan of more than 50% interest is and was entirely illegal in New Jersey. The rates we are talking about are more than five times that great, and the Court instructs you that anyone lending money at those rates simply could not go to court to collect anything, either the loan or the interest, and that such a lender has no legal way to enforce payment. He can only use illegal or criminal means, and he knows it, and the borrower knows it, and you can use this instruction or not, depending upon what you, the jury find to be the fact. Were these loans, or any of them, at 260 or 264% a year, or were they without any interest at all?
 
 
 35
 If you find that they were without interest, then there is no evidence in this case on which you could decide that these were extortionate loans when made. On the other hand if you find there was interest of 260% or 264% a year you may take that fact into account in deciding the key question, whether there was an understanding or an awareness when the loans were made, this being the factor that makes the loans extortionate.
 
 
 36
 Tr. at 392-94 (emphasis added).
 
 
 37
 We agree with the defendants that the trial court erroneously invaded the province of the jury by directing it to assume a fact at issue, see, e. g., Lyons v. United States, 325 F.2d 370 (9th Cir. 1963), cert. denied, 377 U.S. 969, 84 S.Ct. 1650, 12 L.Ed.2d 738 (1964). Under section 892, it is the awareness of the parties at the time the loan was made that is crucial,[3] see note 2 supra, and the existence of this awareness was sharply disputed by defendants. Yet the court in effect told the jury that it had conclusively to presume such awareness from the existence of a very high interest rate. If Congress had intended the amount of interest to serve as conclusive evidence of extortionate lending, it could easily have said so, or it could simply have written the statute to prohibit loans at an interest rate above a certain percentage. It did neither. Instead, it required the Government to prove each party's state of mind.[4] United States v. DeCarlo, 458 F.2d 358, 367 n.12 (3d Cir. 1972) (en banc). The trial court here simply eliminated the Government's burden of proof on that element. This was reversible error, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), unless we are convinced that it was harmless beyond a reasonable doubt, Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
 
 
 38
 We are not so convinced. Defendants denied any awareness that the loans they admitted making were backed by implicit threats of violence. One of the borrowers, Puczilowski, also denied such awareness as of the time the loan was made. Massaro testified that he was aware, at the time the loans were made, of implicit threats. But in view of his criminal record and his apparent desire to cooperate with the FBI in order to have several state charges against him resolved favorably, Tr. at 57-63, the jury could have chosen not to believe him. Because we cannot say beyond a reasonable doubt that the trial court's erroneous charge did not prejudice defendants, the convictions on Counts II, III, IV, and VII must be vacated.
 
 IV.
 
 39
 Defendants also urge us to overturn their convictions for using extortionate means to collect loans from Massaro (Counts V and VI). These convictions, insist defendants, are tainted by the various errors on the other counts.
 
 
 40
 We cannot agree. Counts I, VII, and VIII had nothing to do with the events surrounding the Massaro loans. And while it is true that we have held defendants' convictions for making extortionate extensions of credit to Massaro (Counts II, III, and IV) to be erroneous, they could not have tainted the convictions for using extortionate means to collect the loans from Massaro (Counts V and VI).
 
 
 41
 In order to convict defendants of using extortionate means to collect the Massaro loans, the jury had to find three elements: (1) a collection or attempted collection was made; (2) extortionate means were used; (3) the accused participated knowingly. See 2 E. Devitt & C. Blackmar, supra at § 57.13. It is not necessary to show that the initial loan was extortionate. Id. The trial court explained this to the jury:
 
 
 42
 Now you will recall I told you that Congress denounced two kinds of activities that we are concerned with here. The first is the making of an extortionate loan, which I have just outlined the law on to you. The second activity which this law denounces as a crime is the use of the extortionate means to attempt to collect the debt as well as a conspiracy to do so. The law that applies to this crime has three elements: One, that there is a loan in existence, whether lawful or not, two, that some extortionate means were used to attempt to collect a payment, three, that a defendant on trial knowingly participated in some way, any way, in the use of such means. Knowingly means to act voluntarily and purposely and not by mistake or accident or other innocent reasons.
 
 
 43
 For this second category it doesn't matter whether the loan itself was an extortionate loan or not, nor does it matter who made the loan. This part of the law is directed to the use of any extortionate means to collect or attempt to collect a loan, and anyone who knowingly participates in any way in the use of such means, or who conspires to do so violates that part of the law.
 
 
 44
 Tr. at 394-95 (emphasis added).
 
 
 45
 Thus, the fact that the trial court erroneously instructed the jury to find that there had been extortionate loans made under Counts II, III, and IV could have had no bearing on the jury's decision with respect to Counts V and VI, dealing with the use of extortionate means to collect. The jury was plainly told that the existence vel non of an extortionate loan made no difference on those counts, that they affirmatively had to find the use of extortionate means. In view of the strong evidence relating to the hounding, threatening, and beating of Massaro and his wife, no inference of any attenuated taint arises.
 
 V.
 
 46
 In view of our vacation of the convictions on Counts I, VII, and VIII, we need not consider defendants' contentions that the admission of Father Valentino's testimony was prejudicial error. His testimony related solely to the Puczilowski loans, and we have for the reasons given above vacated defendants' convictions on all of the counts dealing with those loans.
 
 VI.
 
 47
 For the foregoing reasons, the judgments of conviction in both No. 76-1779 and No. 76-2042 will be vacated as to Counts I, II, III, IV, VII, and VIII. The cases will be remanded for new trials on those counts. The judgments of conviction in both cases will be affirmed as to Counts V and VI.[5]
 
 
 
 [1]
 18 U.S.C. § 894 provides as follows:
 § 894. Collection of extensions of credit by extortionate means
 (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
 (1) to collect or attempt to collect any extension of credit, or
 (2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.
 (b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.
 (c) In any prosecution under this section, if evidence has been introduced tending to show the existence, at the time the extension of credit in question was made, of the circumstances described in section 892(b)(1) or the circumstances described in section 892(b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing that words or other means of communication, shown to have been employed as a means of collection, in fact carried an express or implicit threat, the court may in its discretion allow evidence to be introduced tending to show the reputation of the defendant in any community of which the person against whom the alleged threat was made was a member at the time of the collection or attempt at collection.
 18 U.S.C. § 891(7) defines an "extortionate means" as follows:
 (7) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.
 
 
 [2]
 18 U.S.C. § 892 provides as follows:
 § 892. Making extortionate extensions of credit
 (a) Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.
 (b) In any prosecution under this section, if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate, but this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a):
 (1) The repayment of the extension of credit, or the performance of any promise given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor
 (A) in the jurisdiction within which the debtor, if a natural person resided or
 (B) in every jurisdiction within which the debtor, if other than a natural person, was incorporated or qualified to do business at the time the extension of credit was made.
 (2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.
 (3) At the time the extension of credit was made, the debtor reasonably believed that either
 (A) one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or
 (B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.
 (4) Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.
 (c) In any prosecution under this section, if evidence has been introduced tending to show the existence of any of the circumstances described in subsection (b)(1) or (b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing the understanding of the debtor and the creditor at the time the extension of credit was made, the court may in its discretion allow evidence to be introduced tending to show the reputation as to collection practices of the creditor in any community of which the debtor was a member at the time of the extension.
 18 U.S.C. § 891(6) defines an "extortionate extension of credit" as follows:
 (6) An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person.
 
 
 [3]
 Thus, the subsequent use of extortionate means to collect from Massaro, as testified to by Massaro, Park, and D'Amore, does not prove the requisite awareness at the time the loan was made
 
 
 [4]
 It is true that lending at an interest rate in excess of forty-five percent is one of the factors that the Government can use to establish a prima facie case under § 892. See note 2 supra. But other elements of that prima facie case were not shown, and in any event their establishment would not have obviated the Government's requirement to prove the parties' state of mind where that was disputed by defendants. See United States v. DeCarlo, 458 F.2d 358, 361 n.12 (3d Cir. 1972) (en banc)
 
 
 [5]
 Whenever the district "court imposes a jail sentence on only one count, appellate action may, unavoidably, result in an overall miscarriage of justice." McMillen v. United States, 386 F.2d 29, 37 (1st Cir. 1967). Because the "anchor" count in the sentencing scheme Count I has been overturned, defendants will "cheat the hangman" on Counts V and VI. Pugliese v. United States, 353 F.2d 514, 515-16 (1st Cir. 1965); see Whaley v. North Carolina, 379 F.2d 221 (4th Cir. 1967); cf. United States v. Welty, 426 F.2d 615 (3d Cir. 1970)