**UNITED STATES of America**
v.
Angelo DeCARLO et al., Appellant
in No. 18705.

**Appeal of Daniel CECERE.**
**Nos. 18705, 18706.**

United States Court of Appeals,
Third Circuit.

Argued Dec. 4, 1970.

Reargued Jan. 12, 1972 (en banc).

Decided April 4, 1972.

**360**

———◆———

Michael P. Direnzo, New York City, for Angelo DeCarlo.

Michael A. Querques, Isles & Weissbard, Orange, N. J., for Daniel Cecere.

Herbert J. Stern, U. S. Atty., Newark, N. J., for appellee.

Before SEITZ, Chief Judge, and KALODNER, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, MAX ROSENN, JAMES ROSEN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Following a three week jury trial, Angelo DeCarlo and Daniel Cecere [1] were convicted of violations of 18 U.S.C. §§ 892, 894, prohibiting extortionate credit transactions, and they appealed. The original argument of the appeals was on December 4, 1970 and the opinion of the panel was handed down on August 5, 1971. As a result of a petition for rehearing, arguments were submitted to the Court en banc.

The points raised present vexing questions whether certain testimony, admitted into evidence as part of the government's case, should have been excluded and whether even if it were otherwise admissible it was so prejudicial that these defendants should be given a new trial. The issues are vexing not because this record permits any doubt regarding the proclivities of these defendants, but because of our abiding concern that every individual be afforded a fair trial before being convicted.

### 1. Factual Background

The Government's chief witness against DeCarlo and Cecere was Gerald Zelmanowitz, a securities analyst who also engaged in arbitrage.[2] Price differentiations between foreign and domestic markets are so small that Zelmanowitz required large sums of money in order to make his arbitrage operation profitable. He spoke to Louis Saperstein, and convinced him to deposit $50,000 in a Swiss Bank to be used for the arbitrage account, with profits to be divided equally. In search of more funds for the account, Saperstein and Zelmanowitz then approached DeCarlo and asked him to lend them $100,000. DeCarlo referred them to Cecere for the funds, but Cecere turned down their request for a loan. Cecere desired instead to invest that amount of money on behalf of DeCarlo, Polverino and himself in return for 50% of the profits. As a further element of the bargain, the three agreed to cancel a loan of $50,000 which they had previously made to Saperstein and thus increase

---

1. The trials of Joseph Polverino and Peter Landusco were severed because of their illnesses. They, therefore are not parties to this appeal.

2. Arbitrage, as practiced by Zelmanowitz, consisted of buying securities in a foreign market and simultaneously selling them in the United States. Because of fluctuating currency exchange rates and numerous other factors, stock in the same company often trades at different prices in different markets. With sufficient funds, a substantial profit can be made in this manner.

their investment in the arbitrage operation to $150,000. From Saperstein's point of view, this arrangement reduced his outstanding loans from these men to $200,000.

In its initial period, the partnership was a financial success, netting a profit of $85,000 in its first sixteen trading days. The Internal Revenue Service, in December, 1967, however, refused to issue the necessary tax equalization forms to Zelmanowitz, thereby bringing the business to a standstill. Saperstein's serious difficulties with DeCarlo and Cecere began to develop at this point. "Vigorish" payments—the term used by the parties to mean interest—on the $200,000 of outstanding debt were extremely large judging from the $800 per week interest Saperstein owed on the $50,000 debt which had been cancelled. In desperate need of funds, Saperstein told Zelmanowitz that he was in fear of bodily harm because he owed these men a considerable amount of money and convinced Zelmanowitz to permit him to withdraw $40,000 from the arbitrage account in order that he might be current with his payments to DeCarlo and Cecere. In July, 1968, Saperstein again fell behind in his payments and received a loan of $5,000 from Zelmanowitz. Later in the month, Saperstein attempted to borrow an additional $80,000 from Zelmanowitz, and after being refused, asked for $5,000 to meet the "vigorish" payment. In a state of despair, Saperstein then left.

In September, 1968 presumably because of his inability to pay his debts, Saperstein disappeared. Cecere called Zelmanowitz in an attempt to locate Saperstein, telling Zelmanowitz that DeCarlo, Polverino, Landusco, and Cecere merely wanted to sit down with Saperstein to work out a schedule of payments. Zelmanowitz arranged to meet with Saperstein on September 13, 1968 in the Americana Hotel in New York. A meeting was arranged for later in the day between Saperstein, Cecere and a Cecere aide called Lenny. At the second meeting, Saperstein pleaded with Cecere not to harm him, and even went so far as to offer to take out a life insurance policy for $100,000, with Cecere as the beneficiary, and to commit suicide by jumping out a window in return for Cecere's not harming his family. Saperstein was then taken by Cecere and Lenny to a place owned by DeCarlo behind Weiland's Restaurant in Mountainside, New Jersey, and Zelmanowitz was told to meet them there. Zelmanowitz testified that on entering the house:

> "There was a group of people in the first room as I entered, and I heard my name called, and there is another room attached to this room which I entered, and when I got in there Mr. Saperstein was laying on the floor. He was purple. He was bloody. His tongue was hanging out of his mouth * * * I thought he was dead * * *."

He further testified that Polverino and Cecere were kicking and punching Saperstein when he arrived. DeCarlo then entered the room at which time Cecere said to him, "This s. o. b. stole our money. I am going to kill him." DeCarlo told Cecere and Polverino to stop the beating and get outside. DeCarlo, Cecere, Polverino, Zelmanowitz and Saperstein entered a station wagon parked outside and discussed the money owed by Saperstein. After Saperstein told DeCarlo that he had no money at all, DeCarlo told him to pay $5,000 every Thursday and the entire $200,000 by December 13, 1968 or Saperstein "would be dead". Saperstein explained that he had been paying only $3,500 per week in "vigorish" and that the maximum he could afford to pay now was $3,000. DeCarlo's reply was "Forget about it. Bring five or you're dead". Testimony indicated that from September 13, 1968, the date of the beating, until his death from acute arsenic poisoning on November 26, 1968, Saperstein was frequently very depressed.

At some time prior to his death, Saperstein wrote a letter to the Federal Bureau of Investigation that was mailed on November 25, 1968 the day before he died. The following portions of the let-

ter were admitted into evidence with a cautionary instruction:[3]

"Federal Bureau of Investigation, Newark, New Jersey.

"Gentlemen: I am writing you, maybe others can be helped by my plight. On September 13, 1968, I was severely beaten at a place in the rear of Weiland's Restaurant, Route 22, DeCarlo's headquarters. I was then told and given 3 months until December 13, 1968 to pay the entire accumulated amount under threat of death. Cecere, DeCarlo and Polverino, also stated many times my wife and son would be maimed or killed. Please protect my family—I am sure they mean to carry out this threat.

"Last night from my home I called DeCarlo and pleaded for time but to no avail. Over the phone DeCarlo stated unless further monies was paid the threats would be carried out.

Louis B. Saperstein"

### 2. Defendants' Major Contentions

DeCarlo and Cecere advance three major contentions: (1) the statute under which they were indicted is unconstitutional; (2) the district court committed reversible error when it admitted into evidence the letter from Saperstein to the F.B.I., and (3) the admission into evidence of the cause of Saperstein's death was so prejudicial that defendants should be granted new trials.

### A. Constitutionality of the Act

■ The first argument, that the statute is unconstitutional, was laid to rest in the past term of the Supreme Court. In Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the Supreme Court rejected the contentions advanced here and upheld the validity of 18 U.S.C. §§ 892, 894. Further consideration is, thus, unnecessary.

### B. The Saperstein Letter

The second point, concerning the admissibility of the Saperstein letter, raises questions of interpretation of the Act and of the scope of the so-called state-of-mind exception to the hearsay rule. In the district court, both the Government, in offering the letter, and the court, in ruling that certain portions of it were admissible, made clear that the contents of the letter would be used solely to show Saperstein's state of mind during the period of the alleged conspiracy. DeCarlo and Cecere objected to the admission of the letter on the grounds, inter alia, that it was not a proper dying declaration, that the letter was prejudicial, and that they were denied their Sixth Amendment right to confront the witnesses against them. Here, they raise for the first time the additional contention that the letter was irrelevant for the purpose of proving a crime based on the statutory provisions under which DeCarlo and Cecere were indicted.[4]

3. Each member of the jury was also requested to sign a form which stated that the juror had considered the contents of the letter only for the purpose of determining Saperstein's state of mind.

4. The relevant portions of the 18 U.S.C. read as follows:

"§ 891. For the purposes of this chapter:
(6) An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person."

§ 892. *Making extortionate extensions of credit*

(a) Whoever makes any extortionate extensions of credit, or conspires to do so, shall be fined not more than $10,000 or imprisoned not more than 20 years or both.

(b) In any prosecution under this section, if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate, but this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a):

(1) The repayment of the extension of credit, or the performance of any

■ Hearsay is traditionally defined as an unsworn, out-of-court statement offered in court for the truth of the matter stated. *See e. g.,* 5 J. Wigmore, Evidence § 1361 (3d Ed. 1940). Testimony relating to the state of mind of the out-of-court declarant, on the other hand, is generally not hearsay because, although the declaration is unsworn and given out of court, it is not offered for the truth of the matter stated. Doubtless, a number of out-of-court statements could have value both for the truth of the matter they contain and for the state of mind of the declarant. The Saperstein letter is such a statement.

Had the letter been admitted for the truth of its assertions, it would have tended to show that Saperstein was beaten on September 13th and in fact owed DeCarlo and Cecere a sum of money. It would have fallen then within the definition of hearsay, and would not have been admissible unless it came within one of the recognized exceptions to the hearsay rule. However, it was not offered for the truth of the matter stated.

promise given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor . . . at the time the extension of credit was made.

(2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.

(3) At the time the extension of credit was made, the debtor reasonably believed that either

(A) one or more extensions of credit · by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or

(B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.

(4) Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.

(c) In any prosecution under this section, if evidence has been introduced tending to show the existence of any of the circumstances described in subsection (b) (1) or (b) (2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing the understanding of the debtor and the creditor at the time the extension of credit was made, the court may in its discretion allow evidence to be introduced tending to show the reputation as to collection practices of the creditor in a community of which the debtor was a member at the time of the extension.

§ 894. *Collection of extensions of credit by extortionate means*

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.

(c) In any prosecution under this section, if evidence has been introduced tending to show the existence, at the time the extension of credit in question was made, of the circumstances described in section 892(b) (1) or the circumstances described in section 892(b) (2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing that words or other means of communication, shown to have been employed as a means of collection, in fact carried an express or implicit threat, the court may in its discretion allow evidence to be introduced tending to show the reputation of the defendant in any community of which the person against whom the alleged threat was made was a member at the time of the collection or attempt at collection.

When the letter was proffered, the United States Attorney began his argument by stating, "These documents are offered for the limited purpose of showing the state of mind of the victim in this case, Louis B. Saperstein * * * [I]t is our position that * * * the explanations, whether they be written or oral, of the victim of an extortion are admissible for the limited purpose of proving his state of mind, what fears were operating his mind." When ruling that certain portions of the letter were admissible, the district court stated, "I have also reached the opinion as to that portion of the letters which reflect state of mind, that there is an exception to the hearsay rule generally recognized, and I intend to admit in evidence that portion, deleting the material as to the amount owed him and the interest charge."

■ Our inquiry on this point is not ended by the determination that the letter could have shown Saperstein's state of mind, and that it was admitted solely for that purpose.[5] Certain evidence may be capable of inflaming the passions of the jury to the point that when the probative value of the evidence is weighed against the potential prejudice, it should be excluded notwithstanding it would otherwise be admissible.

Undue prejudice to the defendants from the admission of the Saperstein letter could arise only if the jury considered the statements contained therein for the truth of their assertions rather than for their value as showing Saperstein's state of mind. Similarly, the probative value properly accrues when the jury considers the letters only with regard to the state of mind of the writer. The defendants contend that asking the jury to separate the concepts of state of mind and truth of the assertions is similar to requiring them to answer the classic query: "How many angels can dance on the head of a needle?"[6] For this proposition they rely on Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933), and in particular on the statement by Justice Cardozo, "When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out." *Id.* at 104, 54 S.Ct. at 26.

The facts and holding of *Shepard*, however, belie the applicability of this sentence in the context of the present case. There, the defendant was accused of murdering his wife by poison. The Government, in its rebuttal, proved a conversation between the deceased wife and her nurse during which the wife said, "Dr. Shepard has poisoned me." *Id.* at 98, 54 S.Ct. 22. The Government contended in the district court that the conversation was admissible as a dying declaration, and that it should come in for the truth of the matter asserted. The district court admitted the evidence over objection and sent it to the jury on this basis. During argument before the court of appeals and the Supreme Court, the Government altered its theory and contended the statement was admissible to show the wife's state of mind in order to rebut an inference raised by the defense that she had contemplated suicide. The Supreme Court reversed Dr. Shepard's conviction. Justice Cardozo reasoned first that the statement was not admissible as a dying declaration because the necessary elements for a dying declaration had not been shown by the Government and second that hindsight would not suffice to make the state-

---

5. Defendants' Sixth Amendment argument may be disposed of at this point. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), established the rule that in certain situations, evidence admissible as an exception to the hearsay rule should be excluded because if it were admitted, the defendant would be denied his right to confront the witness against him. Rather than proving the truth of the matters asserted, the letter was admitted to prove Saperstein's state of mind. The Saperstein letter, thus, was not hearsay in the context of its admission, and, the Sixth Amendment was in no way infringed.

6. "Quodlibet ascribed to various medieval theologians, c. 1400." A New Dictionary of Quotations 41 (H. Mencken, Ed. 1946).

ment admissible to show state of mind because, "The defendant would have no grievance if the testimony in rebuttal had been narrowed to that point." *Id.* at 104, 54 S.Ct. at 25.

■ In the present case, the record is clear that the Government had no theory other than state of mind for the admissibility of the Saperstein letter, and the Court accepted the proffer on no other basis. In the charge, the jury was instructed, "You may consider [the letter] only for the purpose of deciding whether on the part of Mr. Saperstein there was a state of apprehension and fear of harm." The judge then requested each juror to sign a pledge that he would consider the letter only to determine Saperstein's state of mind because each side conceded that any consideration of the letter by the jury for the truth of its assertions would be improper. Thus we are not confronted with a *Shepard*-type, *post hoc* rationale for the admission of evidence. Rather, the letter was admitted for a narrow purpose, the trial court properly instructed the jury concerning their use of the contents of the letter, and the jury was capable of drawing the required distinction in order that the defendants would not be unduly prejudiced.

As noted above, the defendants have raised for the first time on appeal the contention that Saperstein's state of mind at the time he wrote the letter was not relevant within the meaning of 18 U.S.C. § 891 et seq. They argue that the victim's state of mind is relevant only at the time the extortionate extension of credit is made, while the letter would show state of mind at the time the letter was written—more than two months after the extortion charged by the indictment.

■ Because the precise issue was never presented to the district court, we may not take notice of it unless it is a plain error "affecting substantial rights." Fed.R.Crim.P. 52(b). We have grave doubts whether the claim is cognizable under Rule 52(b); however, assuming that it is, we hold that Saperstein's state of mind at the time he wrote the letter was relevant to the crime charged.

While 18 U.S.C. § 891(6) defines an extortionate extension of credit as "any extension of credit with respect to which it is the understanding of the creditor and debtor *at the time it is made* that delay in making repayment * * * could result in the use of violence * *," (emphasis added), 18 U.S.C. § 894(b) states that, "In any prosecution under this section * * * evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means * * *".

■■ Section 894(b) makes clear the relevance of the victim's state of mind concerning attempts to collect the money owed. Even if the Saperstein letter could rationally show only his state of mind when the letter was written,[7] this apprehension goes directly to the means by which the defendants attempted to collect the money he owed them,[8] and the letter was therefore admissible for this purpose.

*C. Admissibility of Medical Testimony Concerning Cause of Death*

The final argument advanced by the defendants concerns testimony given by a physician as to the cause of Saper-

---

7. In fact, the special form signed by the jurors indicates that they considered the letter regarding Saperstein's state of mind at the time he wrote the letter.

8. Defendants never requested the district court to instruct the jury that the letter might be relevant only to Counts III,

IV, V and VI of the indictment—those charging collections of extensions of credit by extortionate means—nor did they object to the charge in this regard. We do not consider the failure of the judge to so instruct the jury *sua sponte* to be plain error under Fed.R.Crim.P. 52(b).

stein's death. Toward the end of the Government's case-in-chief, Dr. Edwin Albano, the State Medical Examiner, was called. The defendants immediately objected, and at side bar demanded an offer of proof. In order to place in proper perspective the testimony given by Dr. Albano, it is necessary to examine in some detail the events which transpired at the side-bar conference.

The report of the autopsy which had been performed on Saperstein by Dr. Albano appears to have been in the hands of the Government, the defendants and the district court for some time prior to the conference.[9] Cecere's counsel initially objected on the ground that he believed Dr. Albano would testify that Saperstein died of acute arsenic poisoning, and that the jury would be asked to infer or would on its own infer that Cecere and DeCarlo had caused the arsenic to be administered to Saperstein. He stated that the evidence would be "grossly prejudicial in view of the fact that we have stipulated the date of death as being November 26th."

The United States Attorney then presented his offer of proof. During their cross examination of Mrs. Saperstein, the defense had brought to light that several days before Mr. Saperstein died, he had gone out to a restaurant where he ate and drank quite heavily. The Government reasoned that if the defense were attempting to raise in the minds of the jury the possibility that Saperstein died from over-indulgence "as the result tradict Saperstein's apprehensiveness— the Government should be permitted to correct this misimpression by proving the true cause of death. He next argued that "if the defendants had a hand in

the death of Mr. Saperstein, that would certainly be an overt act under the indictment as charged." As his third rationale for permitting Dr. Albano to testify, the United States Attorney's argument was, "If Mr. Sapterstein, because of his state of fear of them, in fear of further physical punishment, [committed suicide] that that would be legally relevant and material as bearing on his state of mind."[10]

Defendants' objections to the offer of proof were overruled, and Dr. Albano took the stand. Over renewed objections, he testified that the cause of Saperstein's death was "Acute arsenic poisoning." The district court denied defendants' contemporaneous motions for mistrial.

Saperstein's death certificate, indicating arsenic poisoning as the cause of death, was admitted into evidence after a defense witness had testified that Saperstein thought he had cancer. Objections by the defendants were again overruled.

■ In addition, the defendants requested the following point for charge.

"I charge you that Louis Saperstein died from causes not attributable to these defendants. Therefore, you are not to think about or speculate as to the circumstances of the ingestion of poison and it should play no part in your discussions, deliberations, or decision."

The district court refused to charge the first sentence, but offered to include the second. The defense stated that such a course of action would be disadvantageous to them, and the charge therefore omitted any reference to Dr. Albano's testimony.[11] The main thrust of the dis-

---

9. The Government offered the autopsy report itself earlier during its examination of Zelmanowitz. The offer was rejected, and instead the parties agreed to stipulate that Saperstein died on November 26, 1968.

10. As transcribed in the record, this statement seems to be somewhat garbled, either because of a mistake in transcription or because in the heat of argument the United States Attorney did not completely

articulate his thoughts. It is apparent that the words "committed suicide" have been omitted from the argument.

11. In its summation, the defense never referred directly to the cause of Saperstein's death, and the United States Attorney only briefly alluded to it when he said, "Your [sic] further heard testimony from Dr. Albano that he performed an autopsy on the exhumed body of Louis Saperstein on the 3rd day of December,

senting opinion is the failure of the trial judge, *sua sponte*, thereafter to instruct the jury that the evidence was to be "limited to Saperstein's state of mind." Defendants argue that whatever the probative value or relevance the testimony by Dr. Albano had regarding cause of death, it was so far outweighed by its prejudicial effect, defendants should be awarded new trials.

Before considering the relevance of, and the possible prejudice caused by, Dr. Albano's testimony, it is necessary to determine the standard by which the district court's ruling is to be judged. The weight of authority indicates that, "Determination of the admissibility of circumstantial evidence is a matter properly referred to the discretion of the trial judge and his ruling should not be disturbed except in the case of a clear abuse of discretion." United States v. Craft, 407 F.2d 1065, 1070 (6th Cir. 1969). This Court has also concluded that, "A trial judge in balancing the probative value of evidence against possible prejudicial effect is vested with broad discretion." United States v. American Radiator & Standard San. Corp., 433 F.2d 174, 203 (3d Cir. 1970) (Seitz, C. J.) cert. denied, 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971); *see* United States v. Schireson, 116 F.2d 881, 883 (3d Cir. 1941); C. McCormick, Evidence § 152 (1954). Rule 403 of the Proposed Rules of Evidence for the United States District Courts and Magistrates (Draft, November 19, 1971) reads in part: "Al-

though relevant, evidence *may* be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice * * *" (emphasis added), thereby codifying the broad discretion vested in the district court. Thus, if the question whether Dr. Albano's testimony was admissible falls within the broad range of the trial judge's permissible exercise of discretion we should not disturb that ruling.

DeCarlo and Cecere assert that the testimony lacked any relevance, or probative value whatsoever. We need examine only one of the prosecution's suggested justifications—that the evidence tended to show suicide—in order to dispel this contention. During the discussion of the Saperstein letter, *supra*, pp. 11–12, it was noted that for purposes of 18 U.S.C. § 894 the victim's state of mind even subsequent to the initial threat of harm is relevant in determining whether Saperstein was in a state of fear regarding collection of the debt.[12] If, in fact, Saperstein had committed suicide in response to the threats of the defendants, that act would be relevant to show the victim's state of mind regarding apprehension of the use of violent means to collect the debt. The Government, however, had offered no direct evidence of suicide caused by threats, and the question with which we are confronted, therefore, is whether, in light of the evidence previously introduced, death by arsenic poisoning was relevant to Saperstein's state of mind.[13]

---

1968 and that he reached a conclusion as to the cause of death, acute arsenic poisoning." We should note here that while the district court gave no charge specifically referring to the arsenic poisoning testimony, the jury was informed, "Now, I must caution you here, ladies and gentlemen, on these conspiracy counts I have referred to 'offense against the United States.' The only offenses which the defendants are charged with conspiring to commit are those offenses that are set forth in what I have called the substantive counts. *There is no charge of conspiracy to commit any other offense*, and each count of the conspiracy relates directly to the substantive offense in another count

in the indictment." (emphasis added). In light of the cautionary instruction we hold that failure to charge *sua sponte* on the use of the testimony of death by arsenic poisoning was not plain error within Fed.R.Crim.P. 52(b).

12. It appears that the state of mind of the victim is not only relevant to the crimes charged in the indictment, but an essential element to be proved by the Government. 18 U.S.C. § 891(6). *Compare* 18 U.S.C. § 1951 (the Hobbs Act).

13. An excellent definition of relevance may be found in Rule 401 of the Proposed Rules of Evidence, *supra*. " 'Relevant evidence' means evidence having *any* tend-

Caught in the vortex, on the one hand, of the desirability of producing all relevant information, and, on the other hand, of excluding anything that may be unduly prejudicial, we face the task of balancing these two competing considerations.

■ A review of the testimony and exhibits which the jury had before it prior to Dr. Albano's taking the stand indicates that Saperstein was terrified of Cecere and DeCarlo. He had begged Zelmanowitz for money to meet his "vigorish" payments. Saperstein had attempted to run away from a scheduled meeting with Cecere in New York City. When that meeting took place, Saperstein offered to take out an insurance policy with Cecere as beneficiary and jump out of a window. Saperstein was then taken to Weiland's Restaurant where he was severely beaten and threatened. The testimony of Mrs. Saperstein further indicated the fear in Saperstein's mind. The evidence tends to demonstrate that Saperstein was so fearful of further physical punishment and for the safety of his wife and family that the jury could reasonably infer that he had committed suicide in order to obviate these apprehensions. Dr. Albano's conclusion of death by ingestion of arsenic was, therefore, relevant to Saperstein's state of mind as it had been developed through the testimony of Zelmanowitz and Mrs. Saperstein.

■ Our next inquiry must be whether the testimony in question was probative on the issue of Saperstein's state of mind, in other words, whether the fact of death by arsenic can rationally tend to show state of mind. If the jury gave credence to Zelmanowitz and Mrs. Saperstein, they could logically have concluded that Saperstein was a man possessed by fear and capable of taking extreme action in order to secure the money needed to pay his debt and to protect his family. The jury could have concluded that suicide was in Saperstein's mind, and that ingestion of arsenic was one means of accomplishing that end. Thus Dr. Albano's statements could have provided one of the links in proving a necessary element of the crimes—fear on the part of the victim of the extortionate plan.

■ Even though the evidence may be relevant and probative, prejudice arising from its introduction may be so great that it should be excluded. The prejudice claimed by the defense is that the testimony suggested commission of a criminal act by the defendants not specified in the indictment. They argue that the jury was invited to speculate that DeCarlo and Cecere murdered Saperstein or played a role in having him killed.[14] If the evidence could serve no purpose other than to cause unwarranted speculation by the jury as to the hand which wrought Saperstein's death, we might tend to agree with the defendants. Here, however, the testimony tends to harm the defendants only to the degree that the jury believed what had already been presented to it. The evidence of death by arsenic poisoning standing alone,

ency to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (emphasis added).

14. It is possible that the suggestion of murder would have been stronger had the fact of death by arsenic poisoning not been introduced. Evidence then would have shown that Saperstein was very afraid of DeCarlo and Cecere, perhaps even paranoid. He was savagely beaten on September 13th, and threatened with death by both defendants. He then wrote a letter to the F.B.I., mailed the day be-

fore he died, expressing his fear and his belief that his life was as good as ended. The following day he died. The jury might then have concluded that Saperstein had been killed.

As the trial actually developed, the inference of suicide became fairly plain. It is pertinent to note that the only evidence tending to show death by other than suicide—murder—was introduced by the defense when a nurse testified that she heard Saperstein tell a doctor in the hospital on the day he died that "someone had put some silver stuff on his food at lunch today. * * * "

could not establish that the defendants were evil individuals. In fact, if the jury were to conclude that DeCarlo and Cecere were evil men, that conclusion would be based on Zelmanowitz's testimony of the beating and the threats, not on Dr. Albano's testimony as to cause of death. To the extent that proof of the cause of death led the jury to infer suicide, the conclusion was not improper were the jury to believe that the beating, the threats and the offer to commit suicide all occurred.

It is contended by the defendants, though, that the real prejudice comes from the possibility that the jury would in essence find DeCarlo and Cecere guilty of murder, and therefore decide that they must be guilty of the lesser crimes actually charged. It is to prevent juries from reasoning in this fashion that proof of uncharged crimes is generally inadmissible. A review of the leading cases discussing the rule, however, shows either their support for admitting the evidence here in question or their inapplicability in this situation. In Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), the defendant was accused of bribing a federal officer. In his defense he called a number of witnesses who testified to his good character. On cross-examination, the Government asked the character witnesses if they knew that the defendant had been arrested 27 years before on a charge of receiving stolen goods. The Supreme Court affirmed the conviction, reasoning that even though proof of prior arrest would tend to show bad character, the probative value of the testimony to impeach the credibility of the character witnesses was sufficient to permit the proof. Likewise, here, the evidence served the legitimate purpose of providing a basis from which the jury could reasonably infer suicide, even though there existed the possibility that the jury might misuse the evidence.

This Court, in Virgin Islands v. Oliver, 360 F.2d 297 (3d Cir. 1966), reversed a conviction because the prosecution proved that the defendant, accused of assault and escape from custody, had once before been convicted for the same acts. Citing United States v. Sweeney, 262 F.2d 272, 277 (3d Cir. 1959), the Court stated, "If the testimony of other offenses does *no more than* show propensity to commit a given crime it is error to admit it." 360 F.2d 299 (emphasis added). In the present case, the evidence of death by arsenic poisoning by itself did not show any propensity to commit a crime on the part of the defendants. That evidence became relevant only insofar as the jury, based on the testimony already adduced, believed that the defendants had bad character. As opposed to the prosecutor's actions in *Oliver*, the Government here did not seek first to prove the bad character of the defendants and then to prove the crimes charged. Rather, by proving the crime first, from which proof the jury was certainly entitled to infer bad character on the part of the defendants, the Government then introduced evidence which tended further to show Saperstein's state of mind.

The dissenting opinion concerns itself not so much with the evidence of death by arsenic poisoning as with the omission of a charge limiting the jury's use of the evidence. The defense did offer a point for charge in this regard, and the trial judge was willing to instruct the jury, "[Y]ou are not to think about or speculate as to the circumstances of the ingestion of poison and it should play no part in your discussions, deliberations, or decision." But, because the evidence in no way would support the first sentence of the charge that, "Louis Saperstein died from causes not attributable to these defendants," the district court properly refused to include this sentence. The defense then made clear that if both sentences were not read to the jury, they did not wish to have the second given alone. In addition, they chose not to submit an alternative charge on this subject, and did not object to the charge's lack of any reference to Saperstein's death by arsenic poisoning.

The dissenting opinion, however, views the colloquy concerning the

point that was submitted as sufficient to preserve any complaint the defense might have with regard to the omission of reference to the evidence. Fed.R. Crim.P. 30 states: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, *stating distinctly the matter to which he objects and the grounds of his objection.*" (emphasis added). Because there existed no evidence to support it, the defense clearly was not entitled to the requested charge. In the absence of an alternative request or specific objection to the omission, it would be unreasonable to expect a judge to construe an ill-founded submission of a point for charge as a request for a limiting instruction on the use the jury might make of Saperstein's death by arsenic poisoning. Therefore, the requirements of Rule 30 have not been met, and the plain error requirement of Fed.R. Crim.P. 52(b) is squarely before us. As indicated in note 11, *supra*, when read as a whole, the district court's charge, especially that portion limiting the jury to deciding only the crimes enunciated in the indictment, sufficiently circumscribed the use the jury could make of the evidence, so that the omission could not constitute plain error.

■ Even if we were not bound by the concept of plain error and the proscriptions of Rule 30, we would not hold that the district court abused its discretion when it did not give a limiting charge. Following the discussion during which the judge eventually properly refused to read the entire defense point for charge, the court was presented with a choice—whether he should fashion his own charge on the evidence, or rely on the general portions of his charge which instructed the jury to consider the evidence only with regard to the crimes set forth in the indictment. *See*, note 11, *supra*. It is crucial here to understand that the district court, and not this court of appeals, was in a position to judge the impact the evidence and closing arguments of counsel had on the jury, and most important, the potential effect of any charge he might give. The evidence of death by arsenic poisoning is not analogous to the Saperstein letter, and did not necessitate a separate cautionary instruction. One unversed in the law would be tempted to read a letter for the truth of its statements, and without being told specifically otherwise, would no doubt do so. With regard to the evidence of arsenic poisoning, however, there is every reason to believe that a charge instructing the jury to consider the evidence only as it related to the crimes alleged in the indictment, would preclude them from misusing the evidence.

■ We are in complete accord with Judge Murrah's statement in Sumrall v. United States, 360 F.2d 311, 314 (10th Cir. 1966), that "the question is not solely whether the appellants have been proven guilty, but whether guilt has been established according to the procedural safeguards to insure trial before a fair and unprejudiced jury." Here, however, the Government did not attempt affirmatively to prove any prior criminal records of Cecere and DeCarlo, thereby implanting in the minds of the jurors the notion that the defendants were evil men. Any such belief could have come only from the testimony of Zelmanowitz and Mrs. Saperstein properly admitted. While it was possible that such testimony could be misused by the jury, the evidence of death by arsenic poisoning served a legitimate purpose—providing a link to determine Saperstein's state of mind. Under these circumstances, it was not an abuse of discretion for the district court to permit Dr. Albano to testify as he did.[15]

Accordingly, the judgments of conviction will be affirmed.

---

15. The same reasoning applies with equal force to the subsequent admission of Saperstein's death certificate during government cross examination of a defense witness.

SEITZ, Chief Judge (concurring).

I seriously doubt that the evidence of arsenic poisoning was admissible. However, I am now satisfied beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. Cf. Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). First, the unsullied evidence of guilt was most substantial. Furthermore, the combined effect of other evidence properly before the jury was as damaging on the "murder" theme as was that of arsenic poisoning, particularly: (1) Saperstein's letter to the F.B.I. disclosing that defendants had threatened to kill him and his family, and (2) the stipulated date of Saperstein's death— one day after the mailing of the letter. Regardless of the evidence of arsenic poisoning, the jury could well have concluded that defendants in fact were responsible for Saperstein's death. Realistically, no instructions could have prevented the jurors from drawing this inference. Thus, I do not believe that the evidence of arsenic poisoning, presumably inadmissible, had any significant impact on the verdict. The best indication that the jury directed its attention to the crime charged is found in the fact that two hours after the jury retired it returned to ask the court for a review of the definition of "extortionate means."

ALDISERT, Circuit Judge (dissenting).

This appeal puts this court to the exacting test of deciding objectively whether a new trial should be ordered where there is overwhelming evidence that the appellants were guilty of the crimes for which they were indicted, and impressive indications that they were nefarious leaders within the internal structure of organized crime in America. As disclosed by the majority's account of appellants' sordid roles in the loanshark-extortion racket, there is little in their conduct capable of generating a sympathetic judicial environment for them and for their ilk. Thus postured, this appeal provides an ideal vehicle for testing the appellate judicial process, for the reviewing court has no authority to determine the appellants' guilt or innocence; this is the exclusive province of the fact finder. The appellate function is severely and strictly limited to a determination of whether error of law, of the type properly cognizable on review, took place in the trial proceedings, I am convinced that such error occurred in this case, and that it was reversible error, compelling a new trial.

The precise error was that the court, having permitted, over defense objection, the introduction of evidence that Saperstein died of arsenic poisoning, failed to give the jury any instruction concerning the relevancy or materiality of this evidence. Indeed, the court at no time offered any explanation as to why the evidence was in fact admitted, even though faced with alternative justifications urged by the government and strenuously objected to by the defense. Appellants were charged with and tried for two crimes; making extortionate extensions of credit, 18 U.S.C.A. § 892, and collecting extensions of credit by extortionate means, 18 U.S.C.A. § 894. To prove its case, the government presented formidable testimony disclosing overt acts by the appellants of threats and actual violence to Saperstein, all of which was relevant under 18 U.S.C.A. § 894(a), employing extortionate means to collect or attempt to collect the debt and punishment for nonrepayment thereof.

Because these threats and acts of violence constituted the principal thrust of the government's case, the cause of Saperstein's death was an issue not completely free of potential prejudice. Indeed, the introduction into evidence of death by arsenic poisoning was potentially generative of substantial prejudice unless accompanied by appropriate limiting instructions by the court.

The majority confine their opinion to a post-trial dissertation of how this evidence could have been considered relevant on the issue of Saperstein's state of mind. Although I am in agreement with much, but not all, of this careful expo-

sition, the fatal deficiency in the majority's presentation is that it fails to rehabilitate the glaring procedural infirmity at trial—the failure to instruct the jury how they should appropriately consider this evidence in their deliberations. An analysis which simply discloses possibilities of relevancy *in vacuo* does not assuage the real jurisprudential hurt: permitting this evidence to hang like an unharnessed omnipresence capable of unrestricted use by the jury, including a use which even the government now concedes to be improper.

It was the contention of the government at trial that the evidence was relevant in three particulars:

1. to counteract the inference suggested by defense cross-examination that Saperstein died of natural causes;

2. to show that defendants "had a hand in the death of Mr. Saperstein, that would certainly be an overt act under the indictment as charged;"

3. "[i]f Mr. Saperstein, because of his state of fear of them, in fear of further physical punishment, [committed suicide], that would be legally relevant

and material as bearing on his state of mind."

The majority quite properly do not attempt to defend the government's first contention. The rather innocuous defense cross-examination of the victim's widow revealed that Saperstein was drinking one evening and did not drive the family car home. At trial the government contended this created the inference that Saperstein died of natural causes, thus permitting introduction of the arsenic ingestion to show the actual cause of death. I believe it strains logic to the breaking point to say this cross-examination raised a permissible inference of the cause of death. In any event, the court gave no instruction so limiting its use.

The second justification urged by the government at trial—proof of overt act under the indictment—was also not approved by the majority, and properly so, for the government itself now concedes that this evidence was neither relevant to nor admissible in the government's case in chief as proof of homicide.[1] Under the circumstances revealed at trial, proof of

---

1. At reargument the government conceded that the evidence was neither relevant nor admissible on this ground:

   Judge Aldisert: I take it then that you are saying . . . you did not introduce this to show homicide.

   U.S. Attorney (Stern): Absolutely.

   Judge Aldisert: But are you saying that if you did, it would have been relevant?

   Mr. Stern: No, . . . But I will stand by my statement that the government at no time intended to prove that these defendants murdered Louis Saperstein.

   \* \* \* \* \*

   Judge Aldisert: Let me start over again. In the government's case, doing what you did do, only what you did do, in the government's case, would it have been admissible, relevant evidence to show homicide on the part of the defendants?

   Mr. Stern: No.

   Judge Aldisert: All right.

   Mr. Stern: I suggest obviously you can't prove just because a man bought a gun, if you don't intend to prove he pulled the trigger.

   After the trial court admitted the evidence over objection, the defense had every right to attempt to mollify the effect of the government's evidence and inquire further into the issue opened by the government. This it could do without waiving its previous objection.

   It has long been the rule that when a party's objection is made and overruled, he is entitled to treat that ruling as the "law of the case" and to explain or rebut, if he can, the evidence which has come in over his protest. Consequently, a party does not waive his objection if he meets the evidence to which he objected with other evidence which under the theory of the objection would be incompetent. United States v. Modern Reed & Rattan Co., Inc., 159 F.2d 656 (2nd Cir. 1947), cert. denied, 331 U.S. 831, 67 S.Ct. 1510, 91 L.Ed. 1845 (1947); McCormick, Law of Evidence, § 55, at 129–130 (1954); 1 Wigmore, Evidence, § 18, at n. 36 & 36a (3d Ed. 1970 Supp.); *cf.* Trouser Corp. of America v. Goodman & Theise, Inc., 153 F.2d 284, 288 n. 6 (3d Cir. 1946). That rule is applicable here.

coerced suicide would have been tantamount to proof of murder. Taking another's life by poison is murder whether the deadly ingredient is unwittingly ingested by the victim as a result of the connivance of a criminal actor, or knowingly ingested, under threat, force or duress at the hands of that actor. Of course, the government's concession has removed consideration of this as evidence of the overt act of murder or coerced suicide. The majority agree stating, "The government, however, had offered no direct evidence of suicide caused by threat, and the question with which we are confronted therefore, is whether, in light of the evidence previously introduced, death by arsenic poisoning was relevant to Saperstein's state of mind." (p. 367.) "They (the defendants) argue that the jury was invited to speculate that De-Carlo and Cecere murdered Saperstein or played a role in having him killed. If the evidence could serve no purpose other than to cause unwarranted speculation by the jury as to the hand which wrought Saperstein's death we might tend to agree with defendants." (pp. 368–369.)

But the majority would legitimate the admission of this evidence for the third reason advanced by the government at trial: "While it was possible that such testimony could be misused by the jury, the evidence of death by arsenic poisoning served a legitimate purpose—providing a link to determine Saperstein's state of mind." (p. 370.)

Assuming, without conceding, the propriety of admissibility for this limited purpose, the prejudicial trial error is that neither the government nor the trial court informed or instructed the jury that the evidence was to be so received and that their consideration was to be so restricted. This is to be contrasted with the meticulous care accompanying the introduction of the Saperstein letter as state-of-mind evidence described in Part B of the majority opinion. In introducing the letter the government stated, "These documents are offered for the limited purpose of showing the state of mind of the victim in this case." Contrariwise,

when the arsenic evidence was introduced, the government insisted that it was also admissible on two other grounds—rebutting the inference of death by natural cause and proof of overt act. Both of these grounds, as heretofore observed, have now been rejected. Moreover, in the Saperstein letter, the court not only gave a limiting instruction, but insisted that, upon returning the verdict, each juror "[sign] a pledge that he had considered the letter only in order to determine Saperstein's state of mind."

I agree completely that "the letter was admitted for a narrow purpose, the trial court properly instructed the jury concerning their use of the contents of the letter, and the jury was capable of drawing the required distinction in order that the defendants would not be unduly prejudiced." (p. 365.) However, the same instructions for restrictive use should have been prescribed for the arsenic evidence, the other evidence limited to Saperstein's state of mind. Further, although I do not believe that the separate juror "pledge" was necessary, such an unusual precaution for the reception of one piece of potentially prejudicial state-of-mind evidence would create an *a fortiori* situation for comparable evidence.

Nor am I persuaded that this trial error can be swept under the jurisprudential rug in the guise of trial court discretion. It may have been discretionary for this court to have received this state-of-mind evidence, but once the discretion was exercised and the evidence admitted, a mandatory duty descended upon the court to inform the jury that they did not have unfettered use of this evidence and that it had to be utilized for a limited purpose only. United States v. McClain, 142 U.S.App.D.C. 213, 440 F.2d 241, 245–246 (1971). See also Commonwealth v. Amos, 445 Pa. 297, 284 A.2d 748, 750 (1971); Commonwealth v. Wright, 415 Pa. 55, 61, 202 A.2d 79, 82–83 (1964).

Nor do I reach the question of plain error. This evidence was the subject of a specific point for charge which was

duly presented and was the subject of colloquy between the court and counsel both prior to the charge as well as thereafter.[2]

In view of the government's concession that it was improper for this evidence to be considered as proof of an overt act of homicide, and the majority's suggestion that such consideration by the jury, without more, would have been prejudicial to the appellants, the failure to give a limiting instruction cannot be construed as harmless error. Clearly there is a "reasonable possibility that the evidence complained of might have contributed to the conviction." Fahy v. Connecticut, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963) ; Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ; McClain, supra, 440 F.2d at 246.

I conclude that a new trial is necessary. Although I reach this conclusion unhappily and reluctantly, I am convinced that the federal courts are guardians of the rights of all members of society, the rich and the poor, the good and the bad. We owe them all one guarantee; the guarantee of a trial that is fairly conducted, wherein it is as important that the procedure utilized in obtaining a verdict be as just as the verdict itself.

Societal order is achieved by enacting standards of conduct, the breach of which subjects the violator to sanctions. The threat of punishment is designed to preserve this order and to deter its breach. It is the genius of the American system that before an alleged transgressor of these standards may be found guilty and thus have punishment visited on him, he is entitled to and is guaranteed an adjudicatory process which is severely regulated and rigidly controlled by procedural rules.

Thus, although it is necessary that those who in fact break standards of conduct be punished and punished properly, it is equally necessary for society itself to observe the rules it has established for the conduct of judicial procedures.

There must be a proper vindication of both rights—society's right that its standards of conduct, or laws, be obeyed, and the individual's right that organized society respect the rules it has established for the conduct of the guilt-determining process. Anything less offends our tradition; and any finding of guilt under the former without a scrupulous respect for the latter yields a conviction that is infirm and legally assailable even where, as here, there is formidable suspicion, if not evidence, that those accused have long participated in a lifestyle of studied defiance of the standards of societal conduct.

I would reverse the judgment of conviction and remand for a new trial.

KALODNER, Circuit Judge (dissenting).

I join in Judge Aldisert's view that reversible error was committed when the trial court "failed to give the jury any

---

2. Even accepting the majority's view, that the extensive concern generated by defense counsel did not amount to a formal objection, I am persuaded that plain error was present here as in McClain, supra, where the evidence was admissible for only one purpose, to prove malice in a homicide case, and inadmissible for other purposes :

> We would hold that whenever evidence is admitted only for a limited purpose, it is plain error, in the absence of manifest waiver, to omit an immediate cautioning instruction. The danger of prejudicial effect from such evidnece is so great that only an immediate and contemporaneous instruction can be considered sufficient to protect defendants. As long as we continue to have rules of evidence which admit testimony for some purposes but not for others, we must guard against its misuse by the jury.

440 F.2d at 246. Cf., United States v. Carter, 401 F.2d 748 (3d Cir. 1968), where the evidence was admissible for several purposes and inadmissible only to show disposition or propensity to commit crime.

instruction concerning the relevancy or materiality" of the Government's evidence that Saperstein died of "acute arsenic poisoning." I fully subscribe to Judge Aldisert's keen critical analysis of the impact of the trial court's error. I can only add that the trial court's failure to instruct the jury with respect to the arsenic poisoning cause-of-death evidence left it like a "dangling participle" in the rhetoric of the court's otherwise adequate charge.

I would also reverse for the reason that the trial court prejudicially erred when it permitted the Government to adduce evidence that Saperstein's death was caused by "acute arsenic poisoning."

The causal factor of Saperstein's death had as much relevance in this case as "[w]ho killed Cock Robin?". There was not a scintilla of evidence connecting the appellants with Saperstein's death. Moreover, the Government and the defendants had entered into a Stipulation that Saperstein had died prior to the trial, and that Stipulation was a "cut-off" as far as the cause of his death was concerned.

It cannot be challenged that the arsenic poisoning evidence, taken at the maximum, could have led the jury to conclude that Saperstein was murdered by the defendants, and at the minimum, that the defendants had driven Saperstein to suicide—self-murder. Thus the admission of the arsenic cause-of-death testimony served to convert this trial into a murder trial instead of one for violation of the federal statutes prohibiting extortionate credit transactions. Indeed, the majority here holds that " . . . the evidence of death by arsenic poisoning served a legitimate purpose—providing a link to determine Saperstein's state of mind," and that "[u]nder these circumstances, it was not an abuse of discretion for the district court to permit Dr. Albano to testify as he did."

I disagree most vigorously with that holding.